## HYMAN–MICHAELS CO. v. UNITED STATES.

### No. 49389.

United States Court of Claims.

June 2, 1953.

Max Siskind, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

On September 15, 1947, the Government sold to the plaintiff a quantity of barbed wire estimated at 2100 long tons, at a price of $120 per ton. The wire was located at Shaiba Depot, in Iraq. The written contract of sale contained the following provision:

"The Seller guarantees that permission to export the property has been granted by the Iraqi Government."

The plaintiff paid the Government $252,-000 for the wire, and removed it from the Shaiba Depot to Basrah, Iraq, where it was placed in storage. The plaintiff promptly began to attempt to resell the wire to a foreign purchaser, but did not succeed in finding one until September, 1948. At that time it agreed upon terms of sale with a purchaser, subject to inspection by the purchaser, the seller to guarantee shipment within 60 days after the purchaser established credit. In order to be in a position to make this sale, the plaintiff applied to the proper authorities in Iraq for permission to export the wire. That permission was refused.

On October 21, 1948 the plaintiff advised the Government that it had been definitely denied the right to export the wire; that this was a breach of the plaintiff's contract with the Government, which breach cancelled the contract. The plaintiff demanded from the Government the return of the purchase price, plus the plaintiff's moving and storage expenses. Such a claim was filed with the Comptroller General of the United States who, on June 22, 1949, denied it. The plaintiff advised the Government that it was attempting to resell the wire in order to mitigate damages. The Government responded that it had no interest in the wire, but agreed that if the plaintiff resold it, that fact would be without prejudice to whatever rights the plaintiff might be held to have against the Government, except that the resale price should be credited to the Government in case the plaintiff recovered in a suit on the contract.

The plaintiff in 1947 obtained an export permit from Iraq and in 1951 sold the wire to a purchaser in India. The price received was $123,695.02 less than what the plaintiff had paid the Government for the wire plus its costs for moving, storing, obtaining permission to export, and delivering the wire. The plaintiff sues for that amount.

The plaintiff's claim is based upon an interpretation of the language quoted above, which appeared in its purchase contract, which would in effect make that language

mean that the Government guaranteed that the Iraqi Government would continue to permit the exportation of the wire for whatever time it might take the plaintiff to make a satisfactory resale of the wire. It says that this was the intention of the parties at the time the contract was made and the language was written.

The negotiations which led to the contract took place in Cairo, Egypt in September 1947. At that time the parties to the negotiation knew that the plaintiff wanted to purchase the wire for resale and hoped to resell it before exporting it; that the Surplus Property Act of 1944, 50 U.S.C.A.Appendix, § 1611 et seq., prohibited the purchaser from importing the wire into the United States; that some time would be required for the plaintiff to resell the wire and export it from Iraq; that it had required some eighteen months for the plaintiff to consummate the resale and export of some surplus property which the plaintiff had purchased from the Government in Europe; that the Government was having some difficulty in obtaining permission from the Government of Iraq to export another lot of barbed wire which had been sold to the Government of Southern Rhodesia. The parties also knew that on September 1, 1947, a Special Committee on Palestine of the United Nations had issued a report containing recommendations for the partition of Palestine; that mass meetings and other demonstrations of protest against this report had occurred in Iraq, Egypt and elsewhere; that there was unrest in the Arab world over the issue and open talk that armed conflict would result if the recommendations of the Special Committee were carried into effect.

The negotiations took place with these facts in the mind of the parties. The Commissioner of this court has found, that the parties contemplated that the language of the contract, which was inserted in all such contracts made during that period, that the United States guaranteed that permission to export had been granted by the Government of Iraq, meant that it guaranteed that the export permit already granted would

remain in force for a reasonable time. Why any persons who could read and write would use such language to express such an intention does not occur to us. And why a purchaser, in the business of buying surplus property abroad and reselling it in any part of the world, who had recently had great difficulty in arranging for the export of such property from a European country, would accept, without question, language relating to a matter of the utmost importance which did not say at all what he now says it meant, is likewise almost incredible. We permit the finding to stand, in spite of these doubts.

The plaintiff, as we have said, would have us go farther and find that the words in question were intended to mean that the Government guaranteed that the right of export would continue for the indefinite future. We could not rationally so conclude. In view of the unrest in the Arab world, it would have seemed at least highly possible, in September 1947, that martial law or some kind of a state of emergency would be declared at almost any time. If that occurred, of course, the exportation of a commodity useful in war, such as barbed wire, would not be permitted. Even the most foolhardy negotiator for the Government would not commit it, without limit, to an obligation completely beyond its power to fulfill. In that situation the parties did not intend their language to mean more than that export would be permissible for a reasonable time. As we have said, we doubt if they intended that much. The eight months from the time the contract was made in September 1947 until Iraq declared martial law in May 1948 was at least as long a time as the contract contemplated, and the Government's obligation with regard to permission to export the wire was no longer in force when martial law was declared. The Government did not breach its contract with the plaintiff.

The plaintiff's petition will be dismissed.

It is so ordered.

HOWELL, WHITAKER and LITTLETON, Judges, and JONES, Chief Judge, concur.